Case. On a policy of insurance, subscribed by the defendant, (amongst others,) on the sloop Mary, William Southern master, from the port of Philadelphia to Trinidad, with a clause therein, that the assured might labour and travail in case of a loss, without prejudice to the insurance.
The plaintiff shipped flour on board the sloop, amounting as per invoice to 935I. 3s. 4d. The sloop sailed from Philadelphia on the 5th May 1789, met with a violent gale of wind on her passage, which greatly injured her sails and rigging, and made her ship much water, and on the 10th June following she made for the first port, and arrived at the island of St Bartholomew on the 20th June in distress, on which day'captain Southern made his regular protest. On the 22d June a survey was had on the sloop, and it was found she could not keep the sea, and on the 24th it was found on a survey of the cargo, that it had received damage in certain specified proportions, the plaintiff’s adventure having been greatly damaged by water.
The captain on his arrival at St. Bartholomew, applied to Nicholas Dawes, esq. a merchant of reputation there, who by letter of 3d July 1789, informed the plaintiff of what had happened, that his flour was so damaged it could not be reshipped, and that there was but little prospect of selling it at first, but that from some fortunate circumstances the cargo was at length disposed of for 3067 dollars.
It appeared on the trial, that one Samuel Keith, a lad about 16 years old, was in the plaintiff’s compting-house, when this letter was received in Philadelphia, on the 23d July. His master was then at Cape May, but previous to his going there, had given him directions, in cases of moment, to apply to Mr. Joseph Fisher, merchant, for his advice and assistance. By his order, the underwriters in the city were called upon, and shewn this letter. Accordingly a number of them met on’ the next day, and a new policy was opened, and subscribed by them on the return cargo, for the benefit of the plaintiff and those concerned. Fisher and three of the insurers were of opinion, that the cargo belonged to the former underwriters, but no advice or directions were given by the latter what steps should be pursued. On the 28th July, the plaintiff returned to Philadelphia, from Cape May, and approved of what had been done. Captain Southern returned also from St. Bartholomew, to Philadelphia on the 29th July, in the sloop Mary, having procured a mainsail from St. Eustatius. He brought dispatches from Mr. Dawes, but no money, pretend- * ing that he had been robbed off the coast of 2470 dol- r*. lars, the nett proceeds of the cargo, which Dawes had L delivered to him. The inconsistency of his story and suspi *465 cion of his conduct induced the plaintiff and the underwriters to agree, that a suit should be brought against him iu the name of the plaintiff, but without prejudice to the claims of either. A recovery was afterwards had thereon, and Southern escaped out of gaol on the ca. sa. for which a suit had been commenced against the sheriff and was still depending.
On the 6th November 1789, the plaintiff formally abandoned the cargo by letter, but his proposition was rejected by the underwriters. He received two other letters from Mr. Dawes, dated July 7th and 20th 1789, which were read on the trial. It was proved, that St. Bartholomews lying to the leeward of Trinidad, the voyage from the former to the latter island, might be made in a fast sailing vessel, in seven or eight days.
On the foregoing facts, it was agreed, that a verdict should be found for the plaintiff for 123I. is. 6d. as for a total loss, subject to the court’s opinion, whether on the facts thus proved, it could be considered' as a total or partial loss ? And if the former, whether an abandonment had been made in due time ?
The cause was tried in January term last, by Messrs. Eewis and Tilghman for the plaintiff, and by Messrs. Ingersoll and Levy for the defendant; and was argued afterwards by them, the same term.
Eor the plaintiff, it was contended, that the matter before the court must be considered in the nature of a motion for a new trial, and not as a case stated, or a special verdict. The court here will weigh all the testimony, and draw inferences therefrom.
It is obvious, that the sloop was not fit to go to sea again, without considerable repairs. She had shipped much water in the course of her passage outwards; the cargo was greatly damaged, particularly the plaintiff’s flour; and in a warm climate, in the midst of summer, it could not have proceeded to a warmer climate, without extreme ris'que. Wherever a vessel does not arrive at her destined port, or the voyage is lost, the insurers must answer as for a total loss. The insured may abandon, i-f the damage exceed half the value of the thing. Le Guidon, c. 7, art. 1. So if the voyage be absolutely lost, or not worth pursuing; if the salvage be one half; if further expence be necessary, and the insurer will not engage at all- events to bear that expence, and in many other cases. Parke on Insur. 164. Cites 2 Burr. 1209. If neither *4681 thing insured, nor the voyage be lost, and *the J damage do not amount to one half of the value, the owner shall not be allowed to abandon. Parke 165. Cites 1 Term Rep. 191. The captain has not an arbitrary power by his act to make the loss either partial or total, as he pleases.. If the voyage be lost, or not worth pursuing, insured may abandon. . Parke 174, 175, 176. Cites Dougl. 319. So if the *466 underwriter refuse to bear the expences, where the salvage is high, and the other expences great. Parke 180, 181. Cites 2 Burr. 1198. 1 Bl. Rep. 276. The true way of considering a policy, is as an insurance on the ship for the voyage. Parke 187. Cites 1 Term Rep. 187. In this instance, it was a contract, that the goods should arrive at Trinidad.
As to the time of making an abandonment, positive regulations in different countries have fixed a precise period, before the insured shall be at liberty to abandon, in the casé of á mere arrest or embargo, by a prince, not an enemy. Parke 170. Cites 2 Burr. 683. But the time of making an abandonment is not fixed by the laws of England; yet it must be done in a reasonable time, according to the circumstances of the case. Parke 92, 192, 193. 1 Term Rep. 616. 2 Term. Rep. 407. It is not meant that the same strictness shall be applied to abandonments, as in the cases of bills of exchange or promissory notes indorsed and dishonoured. 1 Term Rep. 614. The plaintiff’s young clerk, Keith, was not bound to abandon, nor would it be reasonable- to expect it from the plaintiff, on the very day of his return from Cape May; and the day following, Southern returned without the money. But there was an actual abandonment by Keith, who actually shewed the underwriters then in town, the letter from Mr. Dawes the da}' it came to hand, and the next day they met and took measures for their common safety, at all events. All the underwriters to the first policy, except one subscribed the second policy. An abandonment may be in any form, notifying the intention of the parties. Wesk. 6, 7, 376. The insurers did all they could, to procure payment from Southern. Nothing more could have been done, i-f they had received the most formal notice of abandonment. If the insured does no act to abandon, it must be considered as a partial loss. 1 Term Rep. 615. Here there was an act done by the plaintiff’s clerk.
Besides on a dispute taking place between insurers, and the plaintiff on the 20th July, they agreed that a suit should be brought in the name of the latter, for their common benefit; and where one party pursues a middle course pointed out by the other party, the latter must abide by the event of his own interference. 2 Term Rep. 414.
If the plaintiff then did not formally abandon, it was owing to *the conduct of the underwriters; and therefore the r*Aan time of abandonment must be considered as prolonged *- by mutual consent. Such conduct will supercede the necessity of notice. See Parke 173.
But independent of the foregoing observations, it is apprehended to be a material circumstance in this case, that the sloop did not go into the hands of the plaintiff’s agent or consignee, but to Mr. Dawes, who must be considered a mere stranger as to him. A letter from Dawes therefore, did not *467 carry such information as the plaintiff was bound to receive or to credit. It was the mere tale of a third person, on which the plaintiff was neither obliged to give notice of an abandonment to the underwriters, or to take any decided step whatever. The not concealing this letter, and the frank communication of it to the insurers, will surely not be objected by them, as an argument that the plaintiff shall not recover as for a total loss.
For the defendant, it was urged on the first point, that there was no natural or moral impossibility as to the sloop’s going to Trinidad. She had got a mainsail from St. Eusta-tius, and had returned to Philadelphia. Why not then go to Trinidad, which was but seven or eight days sail from St. Bartholomew’s? It is admitted by the plaintiff, that the captain could not change a partial into a total loss; it was therefore a deviation in him to come to Philadelphia, instead of pursuing his destined voyage to Trinidad, which would excuse the underwriters. Besides the goods were not damaged to the amount of half of their value, which the books lay down as necessary in such cases to entitle the party to abandon. The owners can only abandon when there is a total loss. Parke 188. 2 Burr. 1213.
On the second point. Fosses on insurance are of three kinds: 1st, A small or slight one. 2d, Where the object insured is totally lost, as by the vessel foundering. 3d, Where the voyage is defeated, or where the property is damaged at least one half in point of value. The abandonment is at the election of the party insured; he must do the first act. Before the insured can demand as for a total loss, he must abandon to the underwriters. Parke 161. Though in all cases, the insured has a right to say he will abandon, yet he cannot by saying he will abandon, turn a partial into a total loss. Ib. 162. The notice of abandonment must be given the first opportunity, (1 Term Rep. 613,) and the intention must be shewn by some plain act. Ib. 615.
The settled mode of estimating an average loss on an insurance is, that the underwriters shall pay such proportion or *4681 aü * quot part of the prime cost or value, in the policy, J as corresponds with the proportion or aliquot part of the diminution in value occasioned by the damage. 2 Burr. 1172, 1173. The difference between the first cost of the plaintiff’s flour and the sales at St. Bartholomew’s, is so small, that the plaintiff would have gained very considerably, by claiming as for a partial loss, if the nett proceeds had come safe to hand. The flour came unexpectedly to a good market; but the plaintiff shall not be at liberty at the distance of above three months after the intelligence received, to wit, on the 6th November, to recur to the underwriters as for a total loss, when Southern’s breach of trust was known, and his inability to pay was ascertained, and thereby profit by his not *468 making his election in due time. He considered the proceeds as his own, until subsequent events made it necessary that he should play a different game. The insurers could not claim these proceeds, nor controvert or controul Southern’s conduct; but the plaintiff might do it, and he must be considered as his agent. If he could- wait until the event of the return cargo was known, the very reason- of making an abandonment fails, and the underwriters can derive no benefit from the notice. There was a peculiar propriety here in the plaintiff’s being obliged to give early notice of his abandonment, as in a few days the event must certainly happen and be known.
The owner must declare his abandonment, and must elect before he claims a total loss. Parke 182. The information of the clerk to the underwriters, and shewing Mr. Dawes’s letter, does not amount to an abandonment, which ought to be an unequivocal act. More should have been done to shew the intention of the insured, as on an indorsed bill of exchange, which has been dishonored. The mere notice is not knowledge adequate to the purpose, unless where an absolute and entire loss has taken place.
If the plaintiff reposed a trust in his clerk, though of sixteen years of age, he alone shall ‘suffer for his default, if there was any. At any rate, Mr. Fisher must be considered as the agent of the plaintiff, who took every prudent precaution that could be used, not suspecting any embezzlement on the part of the captain. The plaintiff adopted their acts afterwards, by approving of what they had done. The underwriters cannot possibly derive any benefit from the second policy, because they had no legal property at the time of its subscription, in the homeward bound cargo. 1 Wils. 10. 3 Bro. Parl. Cas. 497. The bill of' lading vested the property. 1 Ed. Raym. 175. If the plaintiff, through the instrumentality of Keith and Fisher, acted as the mere agent of the first insurers, when the second policy was * procured, the [-*439 latter should have been previously consulted on this ^ subject, and their assent procured. Their agreeing that an action should be brought against captain Southern for his peculation, will not render that an abandonment which before was none: besides, this was not to operate to the prejudice of the claims of either; and any interference of theirs, after the time for making an election was lapsed, and the event had happened, can never be considered as a prolongation of the time for making an abandonment.
All the cases cited by the plaintiff’s counsel, will be found upon examiuatioii, to lay down this clear principle, that a decided abandonment must be made immediately on notice being received of the loss, or at least in a reasonable time afterwards. Here no such act took place until November 6th. When captain Southern misbehaved, he could only be *469 considered as the agent of the plaintiff, and he only shall suffer by him. Courts construe the acts of the agent as those of the principal, Parke 236, 238. 1 Burr. 489. 2 Term Rep. 189. (Note.)
As to the argument, that Mr. Dawes was not the agent or consignee of the plaintiff, and that therefore the latter was not’ bound to make his election on receiving the intelligence from him, it is answered, that no authority can be shewn in the mercantile law, that intelligence from such a character is indispensably necessary, in order to put the insured to an election. In this case his information was relied on, and the necessary measures taken for securing to the plaintiff the safe arrival of the nett proceeds of the voyage. It is true, intelligence generally and naturally comes through the channel of an agent or consignee, it being the duty of the factor to give every necessary information to his principal; but if there is no doubt of the events having happened in the mind of the insured, and he takes decided measures in consequence of information derived from another quarter, there is the same propriety in making an abandonment in such case, in order that the underwriters may secure themselves as well as they can, as if the intelligence had been received through the medium of an agent. It may be observed, in the language of Mr. Justice Ashurst, in Mitchell and others v. Edie, (1 Term Rep. 613) “ the assured are bound to decide and signify ‘ ‘ their election to the underwriters, whether they will abandon “or not, the first opportunity; and for this reason, that though “the person who takes upon him to act on the occasion for ‘ ‘ the benefit of all concerned is not the agent of the assured, ‘ ‘ yet, if upon receiving notice of the loss, they do not elect to “abandon to the underwriters, they adopt the acts of such “person, and make him their agent;” or in the -words of *4701 “*Mr. Justice Buller (S. C. 617,) when the account of J “a loss has reached the assured, the}’' must take their “election whether they will abandon or not; if they do, they “must give notice of their intention to the underwriters “within a reasonable time; if they act otherwise, they cannot ‘ ‘ be permitted at any subsequent period, to change the partial “into a total loss.”
The chief justice delivered the opinion of the court in January term last, to the following effect:
The circumstances which were disclosed in evidence on the trial, that the sloop was much injured by the gale of wind, and consequently needed many repairs at St. Bartholomews, an island different from the destined port, and in a warm latitude, and the considerable damage which the plaintiff’s flour sustained in the passage, induce us unanimously to think that the voyage was lost, and consequently, the plaintiff might have abandoned and claimed as for a total loss.
On the second point, the law cases are clear, that the in *470 sured must abandon immediately on receiving notice of a loss, or within a reasonable time, if he would demand as for a total loss. His election cannot be suspended until future events arise. It must be quick and unequivocal, and his abandonment must be pure, simple and unconditional. Wesk. 7, cites 2 Valin’s Com. 143. The insurers are hereby enabled to take measures for their own security, which they cannot otherwise effect. The plaintiff’s clerk received intelligence of the loss on the 23d July, and both he and Mr. Joseph Fisher must be considered as his agents, and he moreover approved of what they had done. But no election is made in pursuance of this intelligence, until above three months afterwards. To entitle the plaintiff to a compensation for a total loss, there should have been an absolute abandonment between the 23d and 29th July, of which we have no evidence. On the 6th November he gives formal notice of his abandonment to the underwriters, which would imply that no previous notice of his election had been given. Though the agreement of the plaintiff and the underwriters on the 30th July, to sue captain Southern in the name of the plaintiff, may account for the subsequent delay, yet no satisfactory reason has been given why the election of abandonment was not made and signified to the insurers before that time. The event was then certain, that Southern had returned to Philadelphia without the nett proceeds of the cargo sold at St. Bartholomews, and the plaintiff could not afterwards make his election.
No cases have been shewn to us, evincing that information of a loss must of necessity come from a factor or consignee, before *the insured is put to his election; but if such were the mercantile law, the plaintiff having acted in pursuance of the intelligence received for his own security, he has adopted the acts of Mr. Dawes, and made him his agent.
We are therefore of opinion, that the plaintiff is not entitled to recover of the defendant, as for a total loss, under all the circumstances of this case.
The plaintiff’s counsel hereupon prayed, that they might be permitted to argue the case again, and that no judgment should be entered at this term, for the plaintiff; to which the court gave their assent.
The case was afterwards argued the second time by the same counsel, at the last September term, when the reporter was not present, but no new law authorities were cited on either side, as he is informed; but the plaintiff’s counsel laid considerable stress on the circumstance, that Mr. Dawes could not be considered as the agent or consignee of the plaintiff, and therefore he was not bound thereon, to give any notice of abandonment to the underwriters; to which the defendant’s counsel repeated in substance the answers, which they had before given.
*471 The court held the matter under advisement, until this term; and now, the chief justice having stated the circumstances of the case, declared the unanimous opinion of the court, that the plaintiff was entitled to recover only an average loss from the defendant, and that they saw no sufficient reason to change the sentiments, which they had expressed at the last January term.